

Minute Order Form (06/97)

55-6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 7239 | **DATE** | 9/13/2004 |
| **CASE TITLE** | Patrick Barry vs. Jo Anne Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum Opinion and Order, the court grants summary judgment in favor of the plaintiff [6-1], Patrick Barry, and remands this case to the commissioner for further proceedings consistent with this opinion.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | 2 | **Document Number** |
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | SEP 1 4 2004 | | 14 |
| | Notified counsel by telephone. | | | docketing deputy initials | |
| | Docketing to mail notices. | | | 9/13/2004 | |
| | Mail AO 450 form. | | | date mailed notice | |
| | Copy to judge/magistrate judge. | | | | |
| hmb | courtroom deputy's initials | | Date/time received in central Clerk's Office | hmb mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| PATRICK T. BARRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 03 C 7239 |
| | ) | Nan R. Nolan, |
| JO ANNE B. BARNHART, | ) | Magistrate Judge |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

DOCKETED

SEP 1 4 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff Patrick T. Barry seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423(d). This matter is before the court on the parties' cross-motions for summary judgment. Barry asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision denying Barry's application. For the reasons set forth below, the court grants Barry's motion and remands this case to the Commissioner for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

Barry filed an application for DIB on November 2, 2000, alleging that he had been disabled since June of 2000, due to congestive heart failure, fatigue, and stress. (Administrative Record ("R.") at 48-50, 65). The Agency denied his application at the

14

initial levels of administrative review (R. 29-34, 38-40), and he requested an administrative hearing. (R. 41-41A). On March 19, 2002, an administrative law judge ("ALJ") conducted a hearing at which Barry, represented by counsel, appeared and testified. (R. 216-245). In addition, Ashok Jilhewar, M.D., testified as a medical expert. (R. 219-21, 231-32, 243-44). In a decision dated April 23, 2003, the ALJ found that Barry was not disabled because he retained the ability to perform his past relevant work as an inside telephone salesperson and customer service representative. (R.14-18). This became the final decision of the Commissioner when the Appeals Council denied Barry's request for review of the decision on August 8, 2003. (R. 5-7). *See* 20 C.F.R. §§ 404.955; 404.981. Barry has appealed that decision to the federal district court, where the parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## FACTUAL BACKGROUND

Barry was born on October 15, 1945, making him fifty-seven years old at the time of the ALJ's decision. (R. 48). He graduated from high school in 1964, and went to work as a customer service and sales representative for Svedala Industries. (R. 66, 71, 225). He did his work over the telephone, spent most of the day sitting, and did not have to lift more than three or four pounds at a time. (R. 66, 225-227). He left the job after thirty-six years when he was hospitalized for a blood clot in his leg in June of 2000. (R. 227).

### A. Medical Evidence

The relevant medical evidence in this case dates from June 29, 2000, when Barry was hospitalized at Rush-Copley Medical Center with complaints of leg pain. (R. 107-109). Barry had significant edema, and was jaundiced as well. (R. 110). Examination and x-rays revealed evidence of congestive heart failure and cardiomyopathy.[1] (R. 108, 120). An EKG showed minor, nonspecific changes, but an ECG showed left ventricular ejection fraction to be just 10-15%.[2] (R. 108). A Doppler study revealed deep vein thrombosis in the left leg. (R. 108). A liver function test was abnormal, with elevated enzymes and bilirubin. (R. 108, 111). Ultrasound of the gal bladder and pancreas revealed a large, right pleural effusion. (R. 111, 117). Hepatic veins were prominent. (R. 111). The physician performing the liver consultation felt Barry suffered from chronic liver disease, perhaps due to cardiac cirrhosis or alcohol abuse. (R. 111). Barry admitted to drinking a six-pack of beer per day for many years. (R. 110). Dr. Costanzo, of the cardiac transplant service, recommended that if Barry abstained from alcohol for six months, and potentially became a candidate for a heart transplant, a liver biopsy would

---

[1] Cardiomyopathy is a general diagnostic term designating primary, non-inflammatory disease of the heart muscle, often of obscure or unknown etiology and not the result of ischemic, hypertensive, congenital, valvular, or pericardial disease. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, at 268 (28th ed. 1994).

[2] Ejection fraction refers to the proportion of the volume of blood in the ventricles at the end of diastole – the period of dilation of the heart – that is ejected during systole – the contraction of the heart. It is the stroke-volume divided by the end diastolic volume, and is generally expressed as a percentage. Normal ejection fraction is between 57% and 73%. Lower values indicate ventricular dysfunction. DORLAND'S, at 660.

be necessary to rule out cirrhosis. (R. 108). While Barry weighed 179 pounds upon admission, his discharge weight was 139 following anticoagulant treatment with Coumadin and Heparin. (R. 108). On July 9, 2000, Barry was discharged on several medications, including Coumadin (an anticoagulant to treat thrombosis), Lasix (a diuretic), and Vasotec (for hypertension). (R. 108).

Following his hospitalization, Barry followed a course of treatment with Dr. Santosh Gill, and made regular visits to the Coumadin treatment clinic to monitor the therapeutic levels of that medication and watch for side effects. (R. 143-162). On July 14, 2000, Barry reported that he had no chest pain or shortness of breath. (R. 162). He exhibited 2+ pedal edema. (R. 162). Dr. Gil encouraged Barry to walk five to ten minutes daily, comply with his diet, and abstain from alcohol. (R. 162). By July 27, 2000, Dr. Gil thought Barry might be capable of part-time sedentary work, but recommended that he apply for long-term disability. (R. 159). His cardiomyopathy and congestive heart failure were stable, but he suffered shortness of breath even when lying down. (R. 159). On August 14, 2000, Barry stated that he had no chest pains or shortness of breath, and was sleeping okay. (R. 156). He was abstaining from alcohol and following his diet. (R. 156). Barry reported that he had applied for disability as recommended. (R. 156). Dr. Gil indicated that there was no ankle edema and pedal pulses were good. (R. 156). He also felt that Barry would have to undergo a cardiac catheterization to rule out coronary artery disease in about three months. (R. 156). He

4

encouraged Barry to walk five to ten minutes per day. (R. 156). On September 14, 2000, Barry reported that he was not experiencing any chest pain or shortness of breath. (R. 152). At that time, he was walking two blocks per day; Dr. Gil recommended he increase that to fifteen minutes per day. (R. 152).

By October 25, 2000, Barry's deep vein thrombosis had stabilized, and he returned to the hospital for a cardiac catheterization. (R. 132). An ECG was abnormal, showing left ventricular hypertrophy with repolarization abnormality. (R. 142). According to Dr. Gil, cardiac catheterization revealed coronary artery, but it was not severe enough to explain the left ventricular dysfunction. (R. 147). Barry continued to report he felt "okay" and had no chest pains or shortness of breath. (R. 147). He was trying to walk thirty minutes per day. (R. 147). His physical examination was essentially normal. (R. 147). He reported that he had been granted disability from work, but was also trying to get social security disability. (R. 147). His condition remained essentially unchanged over the next few visits. (R. 143, 206-207).

On January 10, 2001, Dr. Roopa Kari examined Barry at the request of the state disability agency. (R. 169-172). Dr. Kari noted Barry's history of congestive heart failure and deep vein thrombosis. (R. 169). The doctor also noted Barry's complaints of tiring easily and shortness of breath when walking uphill or up stairs. (R. 169-170). Barry reported that, prior to being hospitalized, he drank four beers per day and smoked one-and-a-half to two packs of cigarettes per day. (R. 170). Physical examination was

essentially normal, and cardiac rhythm and heart sounds were normal. (R. 171). Peripheral pulses were normal as well. (R. 171). Dr. Roopa felt Barry's shortness of breath was due to his coronary artery disease or alcoholic cardiomyopathy. (R. 172). The doctor also noted that his deep vein thrombosis was being treated with Coumadin, and that there were no current problems with alcohol. (R. 172).

On February 7, 2001, Dr. Virgilo Pilapil, a state disability agency physician, reviewed the preceding medical records and found that Barry could occasionally lift or carry up to twenty pounds, frequently lift or carry up to ten pounds, stand or walk about six hours of an eight-hour workday, sit about six hours of an eight-hour workday, and push or pull hand or foot controls without limitation. (R.174). He felt that Barry would be able to occasionally climb ramps, stairs, ladders, ropes, or scaffolds. (R. 175).

Barry underwent an ECG on April 18, 2001. (R. 199-200, 206). Ejection fraction at that time was 40%. (R. 199). On June 5, 2001, Barry reported that he had no chest pain, but occasionally became short of breath upon exertion. (R. 199). His finger tips were numb all the time. (R. 199). He was walking twenty to thirty minutes per day. (R. 199). Because Barry's deep vein thrombosis had been treated for a year and his left ventricular function had improved, Dr. Gil felt that Coumadin treatment should be discontinued. (R. 199). He also questioned Barry's compliance with his diet, as he had been gaining weight. (R. 199).

Dr. Reynaldo Gotanco, a state disability agency physician reviewed the medical records accumulated as of July 18, 2001, and found that Barry could occasionally lift or carry up to twenty pounds, frequently lift or carry up to ten pounds, stand or walk about six hours of an eight-hour workday, sit about six hours of an eight-hour workday, and push or pull hand or foot controls without limitation. (R. 185). According to Dr. Gotanco, Barry could occasionally climb ladders, ropes, or scaffolds, and he could frequently climb ramps or stairs. (R. 186).

By August 7, 2001, Barry had lost ten pounds, and was continuing to walk twenty to thirty minutes per day. (R. 198). He stated he was not experiencing shortness of breath or chest pain. (R. 198). On October 30, 2001, Barry and Dr. Gil met to discuss Barry returning to work. (R. 202). Barry reported that he got tired easily, but did not suffer shortness of breath or chest pains. (R. 197). Noting how easily Barry became fatigued, Dr. Gil stated that he "doubt[ed] he can tolerate a full time job, even if sedentary." (R. 197). Dr. Gil placed Barry on medication for high cholesterol. (R. 197). Over the next three visits, Barry continued to complain of tiring easily and a constant numbness in his hands. (R. 194-197).

### B. Plaintiff's Testimony

At the administrative hearing, Barry testified that he lived in a house with his wife and fifteen-year-old daughter. (R. 224). He said he had a driver's license and drove four or five times a week. (R. 224). He was drawing a disability payment from where he

7

previously worked. (R. 225). Barry testified that he left work on June 29, 2000, because of a blood clot in his leg, and had not returned since then. (R. 227).

Barry stated that he continued to see Dr. Gil every two months. (R. 228). She advised him to stay on his medications and walk for exercise. (R. 228). He indicated he was taking several medications, including Coreg (for heart failure or left ventricular dysfunction), Lanoxin (for heart failure), and Aldacort (diuretic). (R. 231). Barry said the medication he took would make him dizzy every once in awhile. (R. 232). He testified that he has not had a drink or a cigarette since he was hospitalized in June of 2000. (R. 233). According to Barry, on a good day, he could walk a mile. (R. 233). He said when he had bad days, he would only walk up and down the block. (R. 240). He said he could stand still for about fifteen minutes before he had to move. (R. 233). He had no trouble sitting. (R. 233). Barry testified that his hands became numb at times, and his fingers felt tingly all the time. (R. 230). As a result, he stated that he tended to drop things. (R. 2340). He said he had no trouble buttoning buttons, however. (R. 234). Barry estimated that he could lift about ten pounds. (R. 235).

Barry testified that, at home, he cooked, loaded the dishwasher and did some vacuuming. (R. 235-236). He explained that activities such as vacuuming or climbing stairs left him short of breath. (R. 240). According to Barry, he usually got up about six each morning, and got his daughter ready for school, although he did not take her to school. (R. 238). He said he was able to grocery shop. (R. 236). Barry said he did not

mow the lawn, but was able to do some yard work, "pulling flowers." (R. 237). On bad days, however, his activities were sharply curtailed. (R. 239-40). Barry testified that he was always tired, and that he had to take naps in the morning and afternoon. (R. 238). Barry said he could not return to his job because it would wear him out; everything seemed to make him tired. (R. 242).

### C. Medical Expert's Testimony and Report

Dr. Ashok Jilhewar appeared at the administrative hearing, scheduled to testify as a medical expert ("ME"). Prior to the hearing, however, Dr. Jilhewar indicated that the medical record was inadequate for him to testify. (R. 219). He explained what records were needed, and Barry's attorney promised to supplement the record accordingly. (R. 219-223). Dr. Jilhewar thought that recovery from alcoholic cardiomyopathy should took about six months. (R. 219). He also indicated that if an ECG was performed more recently than June of 2000, it might be significant in determining whether Barry could work. (R. 219-220). An ejection fraction of 35-40% would be consistent with a capacity for light work, according to Dr. Jilhewar, while 30-35% would be consistent with sedentary work. (R. 220).

Following the administrative hearing, Dr. Jilhewar reviewed the supplemented record, and responded in writing to interrogatories the ALJ submitted. (R. 208-214). Dr. Jilhewar felt Barry had congestive heart failure and deep vein thrombosis of the left leg, that seemed to stem from alcoholic cardiomyopathy. (R. 208). He stated that treating

physicians indicated that the congestive heart failure had resolved, and there had been no alcohol use since the June 2000 hospitalization. (R. 208). According to Dr. Jilhewar, there was a closed period from June 29, 2000, to sometime in April of 2001, during which Barry would have had a capacity for less than sedentary work. (R. 208). This period lasted less than twelve months based upon Barry's ECG in April of 2001, at which time his ejection fraction was 40%. (R. 208). Dr. Jilhewar further indicated that none of Barry's impairments met or equaled an impairment listed as disabling in the regulations. (R. 208). He felt the medical evidence documented Barry's complaints of fatigue and shortness of breath when climbing stairs. (R. 208). The doctor also noted that despite Barry's fatigue, Barry's treating physician stated "the claimant could return to work full time and the claimant is 'going back to work' on 10/04/01 & 10/03/01." (R. 208). Dr. Jilhewar felt Barry could perform the same level of work Dr. Gotanco had concluded he was capable of in July of 2001: light work, which included frequently climbing ramps or stairs, and occasionally climbing ladders, ropes, or scaffolds. (R. 185-186, 214).

## D. The ALJ's Decision

The ALJ found that Barry had not engaged in substantial gainful activity since June of 2000, the date he alleged he became disabled. (R. 15, 17). Next, he determined that Barry had three severe impairments: congestive heart failure, chronic venous insufficiency, and coronary artery disease. (R. 15, 17). These impairments, according to the ALJ, met the Agency's requirement that a severe impairment significantly limit the

ability to perform basic work activities. (*Id.*). *See* 20 C.F.R. § 404.1520(c). The ALJ further determined, however, that none of these impairments, either singly or in combination, met or equaled an impairment listed in the Agency's regulations as disabling. (R. 15, 17). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing of Impairments.

Next, the ALJ assessed Barry's residual functional capacity ("RFC"). In so doing, the ALJ reviewed the medical evidence, beginning with the record of Barry's hospitalization in June of 2000. (R. 15). The ALJ noted that Barry was diagnosed with deep vein thrombosis, cardiomyopathy, congestive heart failure, and hepatic insufficiency. (R. 15). The ALJ also noted that an ECG revealed an ejection fraction of between 10% and 20%. (R. 15). He commented on Barry's course of treatment, including long term Coumadin therapy for deep vein thrombosis. (R. 15). The ALJ found it significant that Barry's condition was reported as stable by December of 2000. (R. 15-16).

The ALJ considered the medical opinions in the record. He related Dr. Jilhewar's testimony and report, noting that the doctor felt that Barry was unable to perform even sedentary work from June 29, 2000, until sometime in April of 2001. (R. 16). At that point, the ALJ explained, Barry's ejection fraction had improved to 40% which, according to Dr. Jilhewar, was consistent with a capacity for light work. (R. 16). Thus, the ALJ concluded that Barry had not been incapacitated for the continuous twelve-month

period required for entitlement to benefits. (R. 16). The ALJ discounted the opinions of the state agency physicians because they were not based on all of the evidence that eventually made its way into the record. (R. 16). The ALJ also addressed the opinion of Barry's treating physician, Dr. Gil. The ALJ said that Barry "was planning to return to work" by October 2001, but that Dr. Gil expressed doubt that he could tolerate even sedentary work in December 2001. (R. 16).[3] The ALJ found Dr. Gil's opinion to be "quite conclusory" as the doctor's report failed to mention the type of significant clinical and laboratory abnormalities that might be expected of one who were disabled. (R. 16). The ALJ also stated that it was at odds with the other medical evidence, and with the other medical opinions of record. (R. 16-17).

The ALJ assessed Barry's symptoms and complaints, stating that he considered the factors described in 20 C.F.R. § 404.1529 and Social Security Ruling 96-7p. (R. 16). According to the ALJ, Barry's complaints of shortness of breath were documented in the record, but Dr. Jilhewar indicated that the medical evidence did not support all of Barry's allegations. (R. 16). The ALJ also noted that Barry had reported being able to partake in a variety of daily activities, albeit for brief periods with opportunities for rest. (R. 16). The ALJ stated that Barry's treating physician had put no restrictions on his activities and had encouraged him to walk for exercise. (R. 16). The ALJ acknowledged that Barry had

---

[3]     Dr. Gil actually made this comment in a report dated October 30, 2001. (R. 197).

sought and received various forms of treatment for his symptoms, and found that this treatment had generally been successful in controlling those symptoms. (R. 16).

After considering the foregoing evidence, the ALJ essentially adopted Dr. Jilhewar's opinion as to Barry's RFC. The ALJ determined that Barry retained the capacity to perform a somewhat restricted range of light work (R. 17), which the regulations define as involving:

> occasionally lifting no more than twenty pounds with frequent lifting or carrying of objects weighing up to ten pounds, or it may involve infrequent lifting but require substantial walking or standing or sitting with the pushing or pulling of arm or leg controls.

20 C.F.R. § 404.1567(b). The ALJ found that Barry was further restricted insofar as he could only occasionally climb ladders, ropes, or scaffolding, and should avoid exposure to hazardous machinery and work at heights. (R. 17). The ALJ then compared this capacity with the requirements of Barry's past work as an inside salesperson and customer representative. Recalling that Barry had reported that his past work required him to lift no more than ten pounds, sit for five-and-a-half hours of an eight-hour workday, and walk or stand for the rest of the day, the ALJ felt that this work was within Barry's residual functional capacity. (R. 17). Accordingly, the ALJ concluded that Barry retained the capacity to perform his past relevant work. (R. 17, 18). As a result, the ALJ found that Barry was not disabled and was not entitled to DIB under the Act. (R. 17, 18).

## DISCUSSION

### A. Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997), *citing Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Binion*, 108 F.3d at 782. Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Id.* Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Id.*

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must have "articulated" the reasons for his decision at "some minimum level." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir.2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Id.* Although the ALJ need

14

not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595.

### B. Five-Step Inquiry

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff is unable to perform any other work in the national economy.

20 C.F.R. §§ 404.1520; *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. §416.920; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir. 1997).

## C. Analysis

Barry challenges the ALJ's decision on just one ground: his treatment of Dr. Gil's opinion as to Barry's ability to work. (*Plaintiff's Motion to Reverse the Final Decision of the Commissioner*, at 6-8). As already noted, Dr. Gil, Barry's treating physician, wrote on October 30, 2000, that Barry "[g]ets tried easily, doubt he can tolerate a full time job even if sedentary." (R. 197). According to Barry, the ALJ should have given this opinion controlling weight because it was "well supported by medically accepted clinical and laboratory diagnostic techniques and [was] not inconsistent with the other substantial evidence in the record." (*Plaintiff's Motion to Reverse the Final Decision of the Commissioner*, at 6-7). Failing that, Barry submits that the ALJ should have at least accorded Dr. Gil's opinion the greatest weight of any opinion in the record. (*Plaintiff's Motion to Reverse the Final Decision of the Commissioner*, at 7).

As Barry suggests, this case does indeed present a choice between conflicting medical opinions. According to Barry's treating physician, Dr. Gil, Barry is not able to perform even sedentary work on a full time basis. According to the ME, Dr. Jilhewar, Barry has the residual functional capacity to perform light work, including the frequent climbing of ramps or stairs, and the occasional climbing of ladders, ropes, or scaffolds. The ALJ clearly chose to accord great, or perhaps controlling weight to Dr. Jilhewar's opinion, while rejecting outright or assigning little weight to Dr. Gil's opinion. While it is up to the ALJ which doctor to believe, his decision must be supported by substantial

16

evidence, and must be articulated in such a fashion to assure the court that the relative merits of each opinion have been duly considered. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996). In this case, the ALJ failed to adequately explain his reasons for adopting the ME's opinion and rejecting the opinion of Barry's treating physician, and the few conclusory reasons he did mention are not supported by substantial evidence. For both of these reasons, the court must remand this case to the Commissioner for further proceedings.

An ALJ must accord a treating physician's opinion regarding the nature and severity of a medical condition controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. See 20 C.F.R. § 404.1527(d)(2); *Dixon*, 270 F.3d at 1177. Should an ALJ determine that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to accord the opinion: length of treatment relationship and frequency of examination; nature and extent of the treatment relationship; supportability; consistency with the record as a whole; and specialization. 20 C.F.R. § 404.1527(d)(2)(i)-(v). Moreover, an ALJ is required to explain the weight given to the opinions of treating physicians; failure to do so is grounds for remand. 20 C.F.R. § 404.1527(d)(2); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). Here, the ALJ failed to address many of the factors the regulations required him to consider when he assessed

Dr. Gil's opinion, leaving the court to speculate whether he considered them at all, and making a remand necessary.

It is unclear, for example, whether the ALJ adequately considered the treating relationship between Barry and Dr. Gil. The ALJ did not mention that Dr. Gil began treating Barry from the date of his hospitalization in June of 2000 and continued to treat him though the close of the record in this case (R. 108-121, 228), or that she saw Barry on a monthly basis for the first six months after his hospitalization (R. 143-162), and on a bimonthly basis thereafter. (R. 194-207). This would certainly seem to be the type of treating relationship that would give Dr. Gil a "longitudinal picture" of Barry's condition, which ought to entitle her opinion to more weight than that of a non-treating source, such as Dr. Jilhewar. 20 C.F.R. § 404.1527(d)(2)(i); *Clifford*, 227 F.3d at 870 ("more weight is generally given to a treating physician because of his greater familiarity with the claimant's conditions and circumstances"). In this instance, it is impossible to tell whether the ALJ brought this factor to bear upon his analysis.

The regulations also require consideration of the "nature and extent of the treatment relationship." 20 C.F.R. §404.1527(d)(2)(ii). As the regulations explain, "the more knowledge a treating source has about [a claimant's] impairment(s) the more weight [the ALJ] will give to the source's medical opinion." *Id.* Notably, in this instance, Dr. Gil's opinion assessed the effect of the very impairments for which she was treating Barry. Under the regulations, this "reasonable knowledge" entitles her opinion, once

again, to more weight. *Id.* Once again, however, the ALJ seemingly ignored this factor. Similarly, the ALJ failed to note that Dr. Gil, licensed to practice medicine since 1981, is a board-certified internist with a primary specialization in cardiovascular diseases. (R. 193). This factor, too, should account for more weight being accorded a treating physician's opinion regarding the effects of cardiovascular disease. 20 C.F.R. § 404.1527(d)(5).

The ALJ ignored the preceding factors, and focused instead on two other factors the regulations regard as necessary to the assignment of weight to any medical opinion: supportability and consistency. 20 C.F.R. §404.1527(d)(3); (4). In this case, the ALJ faulted Dr. Gil's opinion for "providing very little explanation of the evidence relied on," and for failing to reveal the type of significant clinical and laboratory abnormalities one might expect if [Barry] were in fact disabled." (R. 16). He determined that Dr. Gil's opinion was "without substantial support from the other evidence of record, and at odds with the other medical opinions of record." (R. 16-17). As a result of these conclusions, he determined that Dr. Gil's opinion was entitled to little, if any, weight.

The ALJ can reject a treating physician's opinion, but only for reasons that are supported by substantial evidence in the record. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Moreover, the ALJ must adequately explain his reasons for doing so. *Id.*; *Clifford*, 227 F.3d at 870-71. Here, the ALJ simply discounted Dr. Gil's opinion, in conclusory fashion, for failing to reveal laboratory findings, and for being unsupported

by the record or other medical opinions, without an articulation of his analysis that "build[s] an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176. As such, the court is unable to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott,* 297 F.3d at 595. This is significant here, because, without the benefit of an adequately articulated analysis from the ALJ, the court's review of the record suggests that the ALJ was incorrect in his characterization of Dr. Gil's opinion.

Contrary to the ALJ's criticism, Dr. Gil's treatment notes ,in fact, reveal laboratory findings that would seem to be rather significant: the results of Barry's three ECGs. *See* 20 C.F.R. § 404.1528(c) (defining laboratory findings). In June of 2000, an ECG revealed Barry's left ventricular ejection fraction to be 10-15% (R.108). In October of 2000, an ECG was consistent with left ventricular hypertrophy. (R. 142). In April of 2001, Barry's ejection fraction was 40%. (R. 194-199). A normal ejection fraction is said to be between 57% and 73%. DORLAND'S, at 660 (ejection faction is usually 65% +/- 8%). Thus, while Barry's ejection faction had improved from a reading of 10-15% in June 2000, it was still abnormally low at 40% despite ten months of treatment. By way of comparison, under the Listing of Impairments, a claimant suffering from congestive heart failure or cardiomyopathy, and experiencing a marked limitation of physical activity as demonstrated by fatigue, will be found disabled based upon evidence of left ventricular ejection fraction of 30% or less. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§

4.02(B); 4.08. Even Barry's improved ejection fraction, then, would seem to be a laboratory finding that provides support for Dr. Gil's misgivings about Barry returning to even sedentary work full time, but the ALJ failed to acknowledge it as such.

In addition to finding that Dr. Gil failed to provide any evidentiary support for his opinion, the ALJ also discounted Dr. Gil's opinion for being inconsistent with the other medical opinions of record. Because the ALJ found that the opinions of the state agency physicians were not probative, the only other medical opinion of record would be that of Dr. Jilhewar. Dr. Jilhewar – adopting the conclusions one of those state agency physicians – found that Barry could perform light work, including climbing ramps and stairs frequently, and climbing ropes, ladders and scaffolds occasionally. (R. 185-186, 214). Not only did the ALJ rely on Dr. Jilhewar's opinion to undermine the opinion of Dr. Gil, but essentially adopted it as his RFC finding. (R. 17). In so doing, the ALJ accorded great, or more likely controlling weight to Dr. Jilhewar's opinion, although he failed to address any of the factors the regulations indicate he should have considered in rendering such a judgment.

Dr. Jilhewar, whom the ALJ consulted as a medical expert in this case, is a "nonexamining source" under the regulations. 20 C.F.R. § 404.1527(f). As such, the weight to be accorded his opinion is subject to the same considerations as would be the weight to be accorded the opinion of any medical source. 20 C.F.R. § 404.1527(f); (f)(2)(iii). Here, however, the ALJ did not assess Dr. Jilhewar's opinion under any of the

factors set out in the regulations, despite that fact that he obviously assigned it great weight. Again, unless an ALJ adequately articulates his analysis of the evidence, the court is unable to perform a meaningful review of his decision. *Dixon*, 270 F.3d at 1176; *Scott*, 297 F.3d at 595. In this instance, the ALJ's uncritical acceptance of the ME's opinion, without the thorough consideration the regulations require, thwarts review of his decision.

The court's own evaluation of Dr. Jilhewar's opinion in light of the factors set out in the regulations raises several concerns regarding the weight it ought to be accorded. Obviously, because Dr. Jilhewar never treated or even examined Barry, his opinion should not be entitled to more weight than that of Dr. Gil's based on examining or treating relationship. 20 C.F.R. 404.1527(d)(1);(2). In addition, while Dr. Gil is a specialist in the type of impairment at issue here – cardiovascular disease – Dr. Jilhewar is a consulting gastroenterologist with a small practice in primary care internal medicine. (R. 47). Again, this should counsel that more weight be accorded Dr. Gil's opinion. 20 C.F.R. § 404.1527(d)(5). That leaves the remaining two factors of supportability and consistency; the factors under which the ALJ found Dr. Gil's opinion wanting. 20 C.F.R. §404.1527(d)(3);(4). In the case of Dr. Jilhewar, however, the ALJ eschewed criticism and simply accepted the doctor's conclusions without comment. Had the ALJ assessed the ME's opinion under the regulations, however, he may well have found it less than convincing.

Unlike Dr. Gil, Dr. Jilhewar considered Barry's abnormally low ejection fraction to be favorable; positive evidence that Barry can perform light work. This seems counterintuitive, but it may simply be a difference of medical opinion, which would be the ALJ's province to resolve. The ALJ did not do so, however, at least not in writing or in a manner that would assure the court that he performed the requisite analysis. Without any discussion from the ALJ regarding this conflict – which appears to be central to the question of whether Barry is disabled – the court is unable to meaningfully review the ALJ's analysis. The court also finds it curious that Dr. Jilhewar, while indicating that Barry's complaints of fatigue and shortness of breath when climbing stairs are supported by the medical evidence (R. 208, 210), nevertheless finds Barry capable of climbing stairs and ramps frequently during a workday, to say nothing of climbing ropes, ladders and scaffolds occasionally. (R. 185-186, 214). This would seem to be the type of internal inconsistency that ought to lead an ALJ to, at the very least, question the weight a nonexamining physicians opinion deserves.[4] *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995).

In addition to neglecting such inconsistencies, the ALJ also overlooked a flaw in Dr. Jilhewar's opinion that should have impacted upon the weight the ALJ accorded it. As already discussed, the ALJ questioned Dr. Gil's "misgivings"about Barry being able

---

[4]     In this regard, the court notes that the ALJ, somewhat curiously, found that Barry should avoid working at heights, yet also found that he can climb ropes, scaffolding, and ladders, albeit occasionally. (R. 17).

to return to work, and opted instead to rely upon Dr. Jilhewar's feeling that Barry had the capacity to perform light work. But Dr. Jilhewar's opinion is based, perhaps to a substantial degree, on one or more mischaracterizations of Dr. Gil's opinion. Dr. Jilhewar seemingly discounts Barry's complaints of fatigue because his "treating physician states [Barry] could return to full time work and . . . is 'going back to work.'" (R. 208). There is nothing in the record, however, to suggest Dr. Gil ever expressed such an opinion. The portions of the record to which Dr. Jilhewar cites, in fact, either fail to support or directly contradict his characterization of Dr. Gil's thoughts regarding Barry returning to work. (R. 197, 202). Elsewhere in his report, Dr. Jilhewar misquotes Dr. Gil as indicating Barry "[c]an TOLERATE full time job, even if sedentary." (R. 209). Dr. Gil actually expressed his "*doubt* that [Barry] can tolerate a full time job, even if sedentary." (R. 197). These are major mischaracterizations of not only the medical opinion of Barry's treating physician, but of the only other probative medical opinion in the record. (R. 208). These mischaracterizations provide a significant basis for the opinion the ALJ looked to in his critique of Dr. Gil's opinion, and which he adopted as his RFC finding. To the extent Dr. Jilhewar based his opinion on a misreading of Dr. Gil's reports, then, the ALJ's opinion is based on that same misreading, and cannot be found to be supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, the court grants summary judgment in favor of the plaintiff, Patrick Barry, and remands this case to the Commissioner for further proceedings consistent with this opinion.

ENTERED: _Nan R. Nolan_

**NAN R. NOLAN**
**UNITED STATES MAGISTRATE JUDGE**

**DATE:** SEP 1 3 2004